UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK TWAIN GADDIS,

     Plaintiff,

                                 Case No. 18-cv-13763
v.                               Hon. Matthew F. Leitman

CITY OF DETROIT, *et al.*,

     Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 75)

On July 21, 2017, City of Detroit Police Officers Stephen Kue, Justin Marroquin, and Wallace Richards chased, shot, and eventually arrested Plaintiff Mark Twain Gaddis. The officers claimed that they took these actions because they saw Gaddis with a firearm and because Gaddis disobeyed their lawful commands and pointed the firearm at them. Gaddis was later charged with several crimes based upon the officers' allegations against him, but a jury acquitted him of all charges. Gaddis then brought this action against Kue, Marroquin, Richards, and other officers who were involved in the investigation that led to his criminal charges. He asserts claims of excessive force, false arrest, and malicious prosecution under 42 U.S.C. § 1983. He also brings a municipal liability claim against the City of Detroit in which he alleges that the customs, policies, and practices of the Detroit Police Department

1

(the "DPD") led directly to the violations of his constitutional rights.  All of the Defendants have now moved for summary judgment.

The Defendants' motion violates the cardinal rule of summary judgment practice: It does not take the facts in the light most favorable to Gaddis.  On the contrary, the Defendants repeatedly credit their own testimony over conflicting testimony from other witnesses, and they draw inferences in their favor where the evidence reasonably supports a contrary inference that undermines their position.  When the facts are properly viewed in the light most favorable to Gaddis, it becomes clear that all of Gaddis' claims are supported by sufficient evidence to withstand summary judgment.  The Court therefore **DENIES** the Defendants' motion for summary judgment.

# I

## A

The facts most favorable to Gaddis are as follows.  On the evening of July 21, 2017, Gaddis attended a gathering with family and friends outside his aunt's home on Winthrop Street in Detroit, Michigan.  (*See* Gaddis Dep., ECF No. 100-3, PageID.6766-6768.)  The home was on a "safe" street, and the attendees at the gathering felt comfortable congregating in the front yard. (Witness Vincent Houston

Trial Tr., ECF No. 100-2, PageID.6731-6734.[1])  Gaddis did not have a gun while he was at the gathering. (*See* Gaddis Interrogation Statement, ECF No. 75-24, PageID.5605.)

At roughly 9:45 p.m., Kue, Marroquin, and Richards drove down Winthrop Street in a vehicle with its headlights turned off. (*See* Houston Trial Tr., ECF No. 100-2, PageID.6731-6733.)  Kue and Richards were seated in the front of the vehicle; Marroquin was in the rear. (*See* Activity Log, ECF No. 75-5, PageID.5192.)  The vehicle was a black, "semi-marked" Dodge Charger, meaning that it had "Detroit Police" printed on both sides of the vehicle in dark grey letters. (Kue Trial Tr., ECF No. 100-6, PageID.6924.)  Given the time of night and lack of daylight, the grey "Detroit Police" marking on the vehicle was "not easy to see" (Kue Dep. Tr., ECF No. 100-11, PageID.7543), and residents on Winthrop Street were not able to identify the vehicle as a police car. (*See* Houston Trial Tr., ECF No. 100-2, PageID.6734.)  Moreover, the officers were not wearing standard police uniforms. (*See* Kue Trial Tr., ECF No. 100-6, PageID.6923.)  Instead, they wore dark clothing and tactical vests with the word "Police" on the front and back. (*Id.*)

As Kue, Marroquin, and Richards drove closer to the Gaddis family gathering, they double-parked their vehicle behind another vehicle in a spot where the

---

[1] In addition to testifying that Winthrop Street was "safe," witness Vincent Houston testified that some unidentified areas "outside of that street" can be "pretty rough." (Houston Trial Tr., ECF No. 100-2, PageID.6734.)

individuals at the gathering could not see it. (*See* Houston Trial Tr., ECF No. 100-2, PageID.6732; *see also* Gaddis Dep., ECF No. 100-3, PageID.6776.)  After parking, the officers "jumped out of the car" with their guns drawn and rushed toward the gathering. (Houston Trial Tr., ECF No. 100-2, PageID.6725-6727.)  As they charged forward, they did not identify themselves as police officers.  The only thing they said was: "Does anybody have any weapons?" (*Id.*)

Because it was dark and because Kue, Marroquin, and Richards rushed onto the lawn so quickly without identifying themselves, Gaddis did not realize that they were police officers.  (*See* Gaddis Dep., ECF No. 100-3. PageID.6792).  Instead, he was concerned that they might be criminals coming to do harm, and he feared for his safety. (*See id.*, PageID.6785.)  So he began to run away from the officers. (*See id.*, PageID.6782.)  The others gathered on the lawn also seemed to fear the approaching officers, and they all "scattered" as the officers rushed toward them. (*Id.*)

Kue, Marroquin, and Richards chased after Gaddis. (*See id.*) As they ran behind him, they screamed at him, swore at him, and threatened to shoot him if he did not stop running. (*See id.*, PageID.6782-6784; *see also* Witness Roy Robinson Trial Tr., ECF No. 100-4, PageID.6852.)

Eventually, the three officers caught up to Gaddis on the porch of a nearby home. (*See* Witness Dana Bonney Trial Tr., ECF No. 100-12, PageID.7574.)  Gaddis

fell, and the officers began "kickin'," "hittin'," and "stompin'" his body. (*Id.*, PageID.7574-7575.) At some point, the officers wrestled Gaddis into some overgrown bushes and continued "beatin'" and "hittin'" him while they cursed at him. (Robinson Trial Tr., ECF No. 100-4, PageID.6856.) Gaddis eventually managed to break free from the officers and continued running away from them. (*See id.*, PageID.6868.) As he fled, his back was to the officers, his arms were spread wide, and his hands were empty and "wide open." (*Id.*, PageID.6869.)

While Gaddis was running away with his empty hands visible, Kue and Marroquin fired six gunshots at his back. (*See* Kue Dep., ECF No. 100-11, PageID.7554-7555; Marroquin Dep., ECF No. 102-2, PageID.9263.) One of the shots hit Gaddis in his buttocks; another struck Gaddis in the ankle. (*See* Gaddis Hospital Records, ECF No. 100-8, PageID.7021.) Gaddis collapsed and "did not get up again." (Robinson Trial Tr., ECF No. 100-4, PageID.6869.)

As Gaddis was laying on the ground injured, witnesses saw Richards pick up a handgun from the ground. (*See id.*, PageID.6869-6870.) The officers later claimed that Gaddis had discarded the gun as he fled (*see* Kue Dep. Tr., ECF No. 75-9, PageID.5244), but that contention cannot be squared with much of the evidence. For instance, the gun was laying on a street corner that was some distance from where Gaddis fell after he was shot, and witnesses who saw Gaddis running from the officers did not see him throw or drop a gun, did not see him pull a gun from under

his shirt or clothing, and did not see a gun fall off of him. (*See* Bonney Trial Tr., ECF No. 100-12. PageID.7577-7580; *see also* Robinson Trial Tr., ECF No. 100-4. PageID.6869-6872.)

The officers eventually arrested Gaddis and transported him to Sinai-Grace Hospital. (*See* Gaddis Hospital Records, ECF No. 100-8, PageID.7021.)

## B

The officers tell a different version of events.  Kue testified that the officers first encountered Gaddis "standing in the middle of the street," not while he was gathered with friends and family in the front yard of a home. (Kue Trial Tr., ECF No. 100-6, PageID.6928.)  Kue said that he then drove the officers' police vehicle up "right next" to, and "[w]ithin arm's reach" of, Gaddis. (*Id.*, PageID.6929-6930.) At that point, Kue stopped the vehicle and made eye contact with Gaddis. (*Id.*, PageID.6930.)  Gaddis then "turned around, made eye contact with [Kue], and [...] appeared nervous, his eyes widened, and his mouth opened." (*Id.*)   Kue next "illuminated [Gaddis] with [Kue's] flashlight." (*Id.*)  When Kue did so, he "observed a hand gun[] protruding from [Gaddis'] waistband." (*Id.*)

 Gaddis then "took off running, on foot." (*Id.*, PageID.6932.)  Kue stopped the car, exited the vehicle, and yelled that Gaddis had a gun. (*See id.*)  The officers then began "chas[ing]" Gaddis on foot. (*Id.*)  As Kue was pursuing Gaddis, he yelled "police, stop," but Gaddis continued to flee. (*Id.*, PageID.6933.)  Eventually, Gaddis

jumped over a fence into the yard of a nearby home, and he collided with Richards. (*See id.*, PageID.6933-6934.)  The two "fell over[] onto [a] porch," and Richards and Marroquin attempted to "detain" Gaddis. (*Id.*)  Gaddis resisted, struggled, "broke free from [the] officers," and "bladed [*i.e.*, turned] his body toward [the officers] with his handgun in his hand." (Kue Dep., ECF No. 75-8, PageID.5234. *See also id.*, PageID.5242 (explaining that Gaddis "bladed his body while he was running").)  Gaddis then "pointed the gun towards [the officers'] direction." (*Id.*, PageID.5242.)  At that point, Kue "fired [his] first two shots at [Gaddis]." (Kue Trial Tr., ECF No. 100-6, PageID.6938.)  Gaddis took two or three more steps and then fell to the ground. (*See id.*, PageID.6938-6939.)  He then stood up and "blade[d] his body again." (Kue Dep., ECF No. 75-8, PageID.5242.)  Kue responded by firing two more shots at Gaddis. (*See id.*, PageID.5243.)  Marroquin also shot at Gaddis. (*See id.*, PageID.5244.)  Gaddis then "dropp[ed] the gun" and fell "into the middle of the street." (Kue Trial Tr., ECF No. 100-6, PageID.6940.)  The officers then secured Gaddis and the weapon.

## C

After the officers took Gaddis into custody, DPD Detective Khary Mason was assigned to lead the criminal investigation into Gaddis. (*See* Mason Dep., ECF No. 100-10, PageID.7456.)  In that capacity, Mason gathered statements from Kue, Marroquin, and Richards, from those who had been attending the gathering with

Gaddis, and from neighbors who lived nearby and had witnessed the interaction between Gaddis and the officers. (*See id.*, PageID.7458-7460, 7469, 7472.)   The officers gave statements consistent with their version of the events described above. (*See* Warrant Request, ECF No. 75-16, PageID.5451-5452.)   Other witnesses told a different story.  For instance, neighbor Roy Robinson told police that he saw much of the encounter between Gaddis and the officers and that he never saw Gaddis with a gun. (*See* Mason Dep., ECF No. 100-10, PageID.7463-7464.)  Likewise, witness Dana Bonney also told police that she never saw a gun on Gaddis' body. (*See id.*, PageID.7464.)

After Mason finished gathering statements from the officers and the other witnesses, he prepared a warrant request and submitted it to the Wayne County Prosecutor's Office. (*See* Warrant Request, ECF No. 75-16, PageID.5452.)  Mason's report purported to summarize all of the witness statements that he had gathered. (*See id.*).  Mason began by accurately describing the officers' version of events. However, Mason did not accurately describe the statements from the non-officer witnesses.  On the contrary, Mason omitted key exculpatory portions of some of those statements.  For instance, Mason's summary of Robinson's statement did not mention Robinson's remark that he did *not* see Gaddis with a gun. (*See* Mason Dep., ECF No. 100-10, PageID.7463-7464; Warrant Request, ECF No. 75-16, PageID.5452.)  Mason has no explanation as to why he failed to mention this portion

of Robinson's statement. (*See* Mason Dep., ECF No. 100-10, PageID.7463-7464.)

Similarly, Mason omitted from his summary of Bonney's statement her report that

she also did not see Gaddis with a gun. (*See* Warrant Request, ECF No. 75-16,

PageID.5452.)

When Mason submitted his summary report to the Wayne County

Prosecutor's Office, he also gave the reviewing prosecutor a copy of all of the

witness statements that he had collected. (*See* Mason Dep., ECF No. 100-10,

PageID.7463-7464.)  He then met with that prosecutor to review the case. (*See id.*,

PageID.7460.)  The prosecutor thereafter charged Gaddis with carrying a concealed

handgun, possession of a firearm by a convicted felon, assault with a dangerous

weapon, and resisting arrest.   (*See* Criminal Trial Tr., ECF No. 100-19,

PageID.7705-7708.)

Prior to Gaddis' trial, the Michigan State Police Crime Lab conducted DNA

testing on swabs taken from the gun that Richards picked up shortly after Gaddis

was shot. (*See* Forensic Lab Report, ECF No. 100-17, PageID.7663-7664.)   The

swabs contained DNA from "multiple people," but the DNA sample was not of

sufficient quality to permit the lab to identify any of those specific individuals. (*Id.*)

The lab could not say that Gaddis' DNA was on the gun. (*See id.; see also* Michigan

State Police Forensic Scientist Jennifer Dillon Trial Tr., ECF No. 100-18,

PageID.7685-7688.)

After a four-day trial, a jury acquitted Gaddis on all charges. (*See* Criminal Trial Tr., ECF No. 100-19, PageID.7705-7708.)

## D

Gaddis filed this action on December 4, 2018. (*See* Compl., ECF No. 1.)  He brings the following claims under 42 U.S.C. § 1983[2]:

- Excessive Force against Defendants Kue and Marroquin;

- False Arrest against Defendants Kue, Marroquin, and Richards; and

- Malicious Prosecution against Defendants Kue, Marroquin, Richards, and Mason.

Gaddis also brings a claim of municipal liability against the City of Detroit. In that claim, he alleges that the City is liable for the violations of his constitutional rights because the DPD's policies, customs, and/or practices were a "moving force" behind those violations. (*Id.*, PageID.19-20.)

On December 4, 2020, Defendants filed a motion for summary judgment. (*See* Mot., ECF No. 75.)  In that motion, Defendants argue that Gaddis cannot establish that Kue, Marroquin, Richards, and Mason violated any of his (Gaddis') constitutional rights.  Defendants further contend that Kue, Marroquin, and Richards

---

[2] Gaddis originally also brought claims against Detective Patrick Lane. And he initially brought all of his claims against each of the individual Defendants.  But in his response to Defendants' summary judgment motion, he agreed to dismiss his claims against Lane and modify his claims as described above. (*See* Gaddis Resp., ECF No. 99.)  The claims against Lane are therefore **DISMISSED**.

are entitled to qualified immunity. Finally, Defendants assert that even if the individual Defendants violated Gaddis' rights, the evidence does not support a finding of municipal liability against the City.

The Court held a hearing on Defendants' motion on November 18, 2022.

## II

### A

Under Federal Rule of Civil Procedure 56, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326-27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

### B

"Qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "This immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

Once a defendant raises a qualified immunity defense, the "plaintiff bears the burden of showing that [the] defendant is not entitled to qualified immunity." *Id.* "A qualified-immunity inquiry involves two questions: whether defendants violated a constitutional right and whether that right was clearly established." *Brown*, 814 F.3d at 457. "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Id.*

While courts "have discretion to decide the order in which to engage [the] two prongs" of qualified immunity," under both prongs "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014). On the contrary, when ruling upon a motion for summary judgment on a qualified immunity defense, "a court must view the

evidence in the light most favorable to the [party] opposing" the motion. *Id.* (quotation omitted).

In the qualified immunity context, "[t]he sources of clearly established law to be considered are limited. [Courts in this Circuit] look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth] [C]ircuit, and finally to decisions of other circuits." *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013). Courts "must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *District of Columbia v. Wesby*, 138 S.Ct. 577, (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Simply put, defining clearly established law "requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix*, 577 U.S. at 13). And this specificity "is 'especially important in the Fourth Amendment context.'" *Id.* (quoting *Mullenix*, 577 U.S. at 12). "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *Id.* (quoting *Al-Kidd*, 563 U.S. at 741). Thus, as the Sixth Circuit has explained, a "defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite [such] that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or

13

constitutional question confronted by the official beyond debate." *Wenk v. O'Reilly*, 783 F.3d 585, 598 (6th Cir. 2015) (quoting *Plumhoff*, 134 S.Ct. at 2023).

## III

The Court begins with Gaddis' claim that Kue and Marroquin used excessive force in violation of the Fourth Amendment when they shot him. Defendants argue that Kue and Marroquin are entitled to qualified immunity on this claim because they reasonably believed that their use of lethal force was lawful under the circumstances. The Court disagrees. Under the version of the facts that is most favorable to Gaddis, no reasonable officer could have believed that it was lawful to use lethal force against Gaddis.

## A

In *Bouggess v. Mattingly*, 482 F.3d 886 (6th Cir. 2007), the Sixth Circuit summarized the law governing claims that an officer's use of lethal force violates the Fourth Amendment. The court explained:

> Apprehension by use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment. This court assesses the reasonableness of a seizure in distinct stages. An officer's prior errors in judgment do not make a shooting unreasonable as long as the officer acted reasonably during the shooting itself and the few moments directly preceding it. In other words, whether the use of deadly force at a particular moment is reasonable depends primarily on [an] objective assessment of the danger a suspect poses at that moment. The assessment must be made from the perspective of a reasonable officer in the defendant's position. That

objective assessment requires asking whether the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. Under that standard, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given. Absent such probable cause, however, a police officer may not seize a fleeing felon by employing deadly force.

In applying *Garner's* probable cause standard, the Sixth Circuit has focused on the following non-exhaustive list of factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

*Id.* at 889-90 (internal citations and punctuation omitted). When applying this test, a district court's "task [is] to determine whether [the officer who used lethal force] had an objectively reasonable belief that [the suspect] posed an imminent threat of serious physical harm to [the officer] or to others. If [an officer does] not have such a belief, then his use of deadly force violate[s] the Fourth Amendment." *Id.*

### B

Kue and Marroquin insist that the following "facts and circumstances" demonstrate that their "use of [lethal] force" was "reasonable[]" as a matter of law:

First, neither Officer Kue, Marroquin, nor Richards, had ever interacted with Mr. Gaddis prior to the evening of July 21, 2017, and therefore there would have been no personal animus to seek Mr. Gaddis out, or for Officers Kue or Marroquin, to intentionally misrepresent to Officer

15

Richards that Mr. Gaddis was armed as they arrived at the location. Hence, all of the evidence in the record establishes at a minimum, that the Officers believed Mr. Gaddis was armed when he took off running. Additionally, and again, Mr. Gaddis was in a high-crime area, fled immediately upon the officers' arrival at the location, and resisted arrest, eventually breaking free from Officers Richards and Marroquin, but not until after Officer Kue announced again that Mr. Gaddis was still armed. As Mr. Gaddis continued to flee, both Officer Marroquin and Kue testified that the[y] perceived that Mr. Gaddis was blading his body with his arm extended out in their direction when they discharged their weapons.

(Defs' Br., ECF No. 75-2, PageID.5143-5144.)

This theory is flawed because it (1) resolves key factual disputes in favor of Kue and Marroquin, rather than in favor of Gaddis and (2) relies upon the officers' subjective perceptions even though no reasonable officer could have held those same perceptions based upon the evidence taken in the light most favorable to Gaddis.

First, the Defendants' contention that the officers reasonably believed that Gaddis was armed when he took off running cannot be squared with the evidence taken in the light most favorable to Gaddis. The Defendants say that the officers' belief was reasonable because Kue saw a gun in Gaddis' waistband when Kue came within an arm's length of Gaddis in the middle of the street and shined a light on Gaddis. But on the facts most favorable to Gaddis, that encounter between Kue and Gaddis never happened. Instead, as described above, Kue first made contact with Gaddis while Gaddis was standing on a front lawn, and Kue neither got near Gaddis

16

at that point nor shined any sort of light on Gaddis.  Instead, Kue charged at Gaddis in the relative darkness while armed and screaming, and Gaddis immediately fled. On those facts, no reasonable officer would have had a basis to believe that Gaddis was armed when he began running away.

Second, the evidence taken in the light most favorable to Gaddis shows that he was not doing anything that could reasonably have been perceived as "blading his body with his arm extended out in [the officers'] direction when they discharged their weapons." (*Id.*)  As explained above, witness Roy Robinson testified that Gaddis was running *away* from the officers with his hands wide open when the officers shot him. (*See* Robinson Trial Tr., ECF No. 100-4, PageID.6852.)  And Robinson added that Gaddis "never looked back" at the officers as he fled from them. (*Id.*, PageID.6869.)  No reasonable officer could perceive such flight by Gaddis as "blading," nor could any reasonable officer believe that a suspect running directly away from him could be extending an arm *in the officer's direction*.  Likewise, no reasonable officer could perceive a suspect to be holding a gun in his hand where, as Robinson reported about Gaddis, his hands were visibly "wide open" with nothing in them. (*Id.*)

Third, the evidence in the light most favorable to Gaddis does not support Defendants' contention that Kue "announced" that "Mr. Gaddis was still armed" shortly before the officers shot him.  Instead, that evidence shows that the officers

did not say anything about a gun until "[a]fter they shot [Gaddis] down." (Bonney Trial Tr., ECF No. 100-12, PageID.7577; *see also* Robinson Trial Tr., ECF No. 100-4, PageID.6866.)

Finally, Defendants' assertion that Kue and Marroquin encountered Gaddis in a "high-crime" area also fails to take the evidence in the light most favorable to Gaddis. That evidence shows that the street on which the officers found Gaddis was a "safe community" where the neighbors all know each other and where "not a whole lot of bad stuff happens." (Houston Trial Tr., ECF No. 100-2, PageID.6731-6733.)

Because the Defendants fail to take these key facts in the light most favorable to Gaddis, the Court will not grant summary judgment in favor of Kue and Marroquin based upon the arguments in Defendants' motion.

### C

Even though Defendants' arguments are flawed for the reasons explained above, the question remains: Is the evidence, when viewed in favor of Gaddis, sufficient to overcome Kue's and Marroquin's qualified immunity defense? It is.

Taken in the light most favorable to Gaddis, the evidence establishes that Kue and Marroquin shot Gaddis (1) as he was running away from them, with his back to them and his hands wide open and empty and (2) even though he had not displayed or threatened to use a firearm. The Sixth Circuit's decision in *Bouggess*, *supra*,

clearly established that the use of lethal force under those circumstances amounted to excessive force.

In *Bouggess*, an undercover officer attempted to arrest a suspect to whom he had sold narcotics as part of a sting operation. The suspect resisted, and "a struggle ensued between the two men." *Bouggess*, 482 F.3d at 888. "No guns were drawn and no shots were fired during the struggle." *Id*. Following the struggle, the suspect "broke free from [the officer] and ran directly away" from the officer. *Id*. at 889. The officer then "drew his gun and fired at least three shots" at the suspect. *Id*. The suspect died, and a medical examiner later concluded that the suspect had been shot three times "in the back." *Id*. The suspect's estate then brought an excessive force claim against the officer. The district court denied the officer's motion for summary judgment based upon qualified immunity, and the Sixth Circuit affirmed.

The Sixth Circuit explained that it "cannot reasonably be contended that physically resisting arrest, without evidence of the employment or drawing of a deadly weapon, and without evidence of any intention on the suspect's part to seriously harm the officer, could constitute probable cause that [a] suspect posed an imminent danger of *serious* physical harm to the officer or to others," so as to justify the officer's use of lethal force. *Id*. at 891 (emphasis in original). And the court added that, while a suspect's act of resisting arrest "justifies force, it does not justify *deadly* force, especially when the struggle has concluded and the suspect is in flight."

*Id*. (emphasis in original).  The *Bouggess* court ultimately held that the evidence was sufficient to establish that the use of deadly force was excessive because a jury could find that the officer "began to fire" after his struggle with the suspect had "concluded" and after the suspect had taken "flight." *Id*. at 892.  Ten years after *Bouggess*, the Sixth Circuit confirmed that that decision "made clear" that a police officer may not shoot a fleeing suspect with whom the officer has struggled where the officer has no reason to believe that the suspect poses a risk of serious harm to the officer or to others. *Carden v. City of Knoxville*, 699 F. App'x 495, 498 (6th Cir. 2007) (holding, in light of *Bouggess*, that police officer was not entitled to qualified immunity from excessive force claim where officer shot fleeing suspect who had "forcefully resisted" the officer's effort to arrest him by, among other things, punching the officer).  *Bouggess* leaves no doubt that Kue and Marroquin are not entitled to qualified immunity because, on the facts of this case taken in the light most favorable to Gaddis, the officers violated Gaddis' clearly-established Fourth Amendment right to be free from excessive force.

*Bouggess* further makes clear that Kue and Marroquin would not be entitled to qualified immunity even if, contrary to the facts taken in the light most favorable to Gaddis, they could reasonably have believed that Gaddis was armed when they shot him.  In *Bouggess*, the officer who used lethal force argued that he had the right to use such force because he believed that the fleeing suspect was armed. *See*

*Bouggess*, 482 F.3d at 896.  The Sixth Circuit disagreed.   It said that "even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* justified." *Id.* at 896 (emphasis in original).   In the court's words, a fleeing suspect's "mere possession of a weapon is not enough" to justify an officer's use of lethal force against the suspect. *Id.*  Instead, "when a police officer both knows a defendant has a weapon *and* has a reasonable belief that the weapon will be used against him or others, the officer is justified in using deadly force." *Id.* (emphasis in original). Thus, even if Kue and Marroquin believed that Gaddis was armed when they first saw him, that would not have justified their use of force against him when he fled because, under the facts taken in the light most favorable to Gaddis, the officers could not reasonably have believed that Gaddis was going to use the weapon against them or others when they shot him as he was running away from them with his hands wide open and empty.

For all of these reasons, Kue and Marroquin are not entitled to qualified immunity from Gaddis' excessive force claim against them.

## IV

The Court next turns to Gaddis' false arrest claim.  In this claim, Gaddis alleges that Kue, Marroquin, and Richards violated the Fourth Amendment by arresting him without probable cause. (*See* Compl., ECF No. 1, PageID.13.)

Defendants argue that the officers are entitled to summary judgment on this claim for several reasons.  First, they contend that there was probable cause to arrest Gaddis.  Second, they argue that even if probable cause was lacking, the officers are entitled to qualified immunity from this claim because they reasonably, even if mistakenly, believed that they had probable cause to arrest Gaddis.  Third, they contend that Gaddis cannot prevail on this claim because there were several outstanding warrants for his arrest when the officers arrested him.  Fourth, they assert that Gaddis may not challenge the probable cause supporting his arrest in this civil proceeding because he was afforded an opportunity to challenge probable cause during his criminal trial and failed to do so.   Finally, Richards (alone) argues that he cannot be held liable for false arrest because he relied upon statements by Kue and Marroquin that Gaddis had engaged in conduct that established probable cause for his arrest.  The Court considers each of these arguments in turn.

## A

The Court begins with Defendants' contention that Gaddis' false arrest claim fails because the officers had probable cause to believe that he had committed a crime when they arrested him.  Probable cause for an arrest exists when the "facts and circumstances within the officer's knowledge [ ] are sufficient to warrant a prudent person … in believing … that the suspect committed, is committing, or is

about to commit an offense." *Smith v. City of Wyoming*, 821 F.3d 697, 715 (2016)

(quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

Defendants argue that the officers had probable cause to arrest Gaddis for the

following reasons:

> Even assuming *arguendo*, that Mr. Gaddis did not possess
> a firearm on the night of January 21, 2017, there was
> nonetheless probable for his arrest. Regardless of whether
> Mr. Gaddis was in possession of a firearm, this has no
> bearing on what Officers Kue and Marroquin observed, or
> *at a minimum believed* they observed; *i.e.*, a firearm in Mr.
> Gaddis' waistband, and what they reported to Officer
> Richards. Next, the parties unanimously agree that when
> Officers Kue, Marroquin, and Richards arrived at the
> location, Mr. Gaddis immediately fled on foot.  Under
> similar circumstance in *United States v. Jones*, the Sixth
> Circuit explained as follows:
>
> > Although presence in a high crime area standing
> > alone cannot create reasonable suspicion of criminal
> > activity, it is one relevant factor in the reasonable
> > suspicion calculus. Officers are not required to
> > ignore the relevant characteristics of a location in
> > determining whether the circumstances are
> > sufficiently suspicious to warrant further
> > investigation. So the area's high crime nature raised
> > at least some suspicion of criminal activity. Second,
> > unprovoked flight upon noticing the police is
> > another relevant factor. In *Wardlow*, the Supreme
> > Court held officers had reasonable suspicion of
> > criminal activity based solely on presence in a high-
> > crime area combined with headlong flight from
> > police.
>
> Thus, there can be no legitimate argument that the officers
> at least *believed* that there was criminal activity afoot.
> From there, Mr. Gaddis' active resistance to the officers

attempt to detain him, the blading of his body and pointing a weapon, *or what was perceived to be* the pointing of a weapon, at Officers Kue and Marroquin, and Officer Richards' recovery of a handgun in the vicinity of where Mr. Gaddis fell, further established the requisite probable cause for his arrest and prosecution.

(Defs' Br., ECF No. 75-2, PageID.5133-5134, footnotes omitted, emphasis in original.)

Like Defendants' argument on Gaddis' excessive force claim, this argument fails because it does not take the facts in the light most favorable to Gaddis. On the facts most favorable to Gaddis, the officers encountered him in the front yard of a home in a "safe" location, not in the middle of the street in a "high crime" area. Likewise, on that version of the facts, Kue did not see a gun in Gaddis' waistband before the officers started chasing him. Nor was Gaddis' flight "unprovoked." Instead, he ran away because he was being charged by gun-toting, screaming men who were not readily identifiable as law enforcement officers when he first saw them in the dark.[3] Moreover, for all of the reasons explained above, on the version of the facts taken in Gaddis' favor, no reasonable officer could have perceived that Gaddis

---

[3] As this Court has previously explained, a suspect's flight from an unidentified threat does not suggest in any way that the suspect has broken the law. *See Fleming v. Scruggs*, 465 F.Supp.3d 720, 734 (E.D. Mich. 2020) (holding that a suspect's flight from law enforcement officers who followed him without identifying themselves did not support a reasonable belief that the suspect had committed a crime).

was "blading" his body or pointing a weapon as he fled.  And the facts most favorable to Gaddis do not support the contention that he knowingly resisted arrest. Rather, those facts show that he was simply trying to get away from his unidentified assailants as they chased and beat him without justification. That conduct does not constitute resistance under Michigan law. *See* Mich. Comp. Laws § 750.81d(1) (providing that a person commits the offense of resisting and obstructing an officer only where he "knows or has reason to know" that he is opposing a law enforcement officer); *People v. Moreno*, 814 N.W.2d 624 (Mich. 2012) (holding that Section 750.81d(1) did not abrogate the common law right to resist an unlawful arrest or other unlawful police conduct).

Finally, Defendants have not even attempted to explain how the alleged recovery of a gun supports their contention that the officers had probable cause to believe that Gaddis committed a crime.[4]  In any event, it is not clear how the alleged discovery of the gun would be relevant to the probable cause inquiry because the officers supposedly discovered the gun *after* they had already seized Gaddis by shooting him. *See Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006) (noting

---

[4] Perhaps Defendants mean to suggest that upon discovering the gun, they had probable cause to believe that Gaddis had committed the offense of possession of a firearm during the commission of a felony – with the felony being his resisting and obstructing their efforts to detain him.  However, for the reasons explained above, under the facts viewed in Gaddis' favor, no reasonable officer could have concluded that Gaddis committed the offenses of resisting and obstructing an officer in violation of Mich. Comp. Laws § 750.81d(1).

that "we have previously held that apprehending an individual by way of shooting constitutes a seizure.").

For all of these reasons, the Court rejects Defendants' argument that Gaddis' false arrest claim fails because the officers had probable cause to arrest him.

## B

The Court next turns to Defendants' contention that even if the officers did not actually have probable cause to arrest Gaddis, the officers are entitled to qualified immunity because they reasonably believed that they had probable cause for the arrest. Defendants offer separate qualified immunity defenses for Kue and Marroquin, on one hand, and for Richards, on the other hand. The Court addresses these defenses separately.

As to Kue and Marroquin, Defendants' qualified immunity argument is as follows:

> [W]hile Plaintiff denies actually possessing a firearm on the night of July 21, 2017, that is not the relevant inquiry. Instead, and as recently explained in *Ashford v. Raby*, the relevant inquiry is whether the officers *belief* that Mr. Gaddis was in possession of a firearm was reasonable.
>
>> This case comes down to a matter of perspective. After a car chase, law enforcement used a police dog to remove a driver from his vehicle. From the driver's perspective, this was an unprovoked attack on a cooperating suspect. From the officer's perspective, it was the best way to gain control of the situation. The district court granted the officer qualified immunity. Because existing law did not

26

> clearly establish that the officer's **perspective** was unreasonable, we affirm.
>
> **Certainly**, Defendants do not concede that Plaintiff was not in possession of a firearm, but for purposes of Plaintiff's False Arrest and Malicious Prosecution claims (and later, Plaintiff's Excessive Force claim), the appropriate inquiry is whether the officers **belief** that Mr. Gaddis was in possession of a firearm was reasonable. "*Perhaps*" Officers Kue and Marroquin were mistaken about Mr. Gaddis possessing a firearm, but as in *Ashford*, this Honorable Court must "[t]hink about it  from the officers' perspective…" In *Ashford*, Plaintiff had led law enforcement on a two-and-a-half-minute highway chase and was now refusing to get out of his vehicle." Here, Mr. Gaddis was in a high-crime area, fled immediately upon the officers' arrival at the location, resisted arrest, and a firearm was recovered by Officer Richards immediately after and in close proximity to where Mr. Gaddis was shot. Considering these factors **from the Officers' perspective**, just as in *Ashford* where the Court held, "[s]urely, a reasonable officer would believe it appropriate to remove [Plaintiff] from his vehicle at that point," surely in this instance, a reasonable officer would believe it appropriate to arrest and Plaintiff and "in the end, nothing about [Defendant's seizure of Plaintiff] violated clearly established law. Thus, [Defendant] is entitled to qualified immunity."

(Defs' Br., ECF No. 75-2, PageID.5137-5138, emphasis in original.)

This argument again fails to take the evidence in the light most favorable to Gaddis.  On those facts, the officers did not make any observation that could have supported a reasonable belief that Gaddis had a gun, Gaddis was not in a "high crime" area, did not physically resist arrest, and did not undertake unprovoked flight. In addition, under those facts, the officers aggressively charged at him without

identifying themselves, chased him, threatened him, and swore at him as he ran away, beat and kicked him when they caught up to him, and shot him as he attempted to escape the beating they were administering. No reasonable officer could conclude based upon those facts that probable cause existed to arrest Gaddis. Kue and Marroquin are therefore not entitled to qualified immunity on Gaddis' false arrest claim.

Defendants also present a qualified immunity defense that applies to Richards alone. They argue:

> [I] is important to note that at no time has Officer Richards ever testified that he observed the firearm that he would later recover in Mr. Gaddis's possession. In other words, Officer Richards' pursuit of Mr. Gaddis and his attempts to apprehend him were premised solely upon Officer Kue and Marroquin's statements that Mr. Gaddis was armed and Mr. Gaddis' sudden and unprovoked flight from the officers. Officer Richards has never wavered in his testimony on this issue. "Our cases absolve officers of liability where they rely upon information transmitted from other officers." The record and Officer Richards' testimony is both clear and uncontroverted: i) he relied upon information relayed to him by his fellow officers that Mr. Gaddis was armed; ii) he observed Mr. Gaddis take off running; iii) Mr. Gaddis resisted Officer Richards' attempts to arrest and detain him; and iv) Officer Richards recovered a handgun in the proximity of where Mr. Gaddis was shot. *As all of these facts are uncontroverted*, Officer Richards cannot be found liable for Mr. Gaddis' arrest and prosecution.

(*Id.*, PageID.5136-5137, emphasis added.)

But Richards' version of the facts is *not* "uncontroverted."  As noted above, on the version of the facts most favorable to Gaddis, he did not resist arrest; he was the victim of a beating.  And he did not knowingly attempt to evade any police officers.  Instead, he ran away from gun-toting, screaming men who were charging at him while not readily identifiable as police officers.  Moreover, Richards never explains why the information relayed to him by Kue and Marroquin – that they believed they saw Gaddis with a gun – lends support to the conclusion that there was probable cause to arrest Gaddis.  Thus, because Richards also fails to take the evidence in the lights most favorable to Gaddis, he is also not entitled to qualified immunity on Gaddis' false arrest claim.

## C

The Court next addresses Defendants' argument that Gaddis' false arrest claim fails as a matter of law because, at the time he was arrested, there were several outstanding warrants for his arrest.  Defendants admit the officers were not aware of the warrants at the time they arrested Gaddis, but Defendants insist that the warrants nonetheless justified the arrest and insulate the officers from liability for false arrest. The Court disagrees.

"It is clearly established that officers must have probable cause to make an arrest." *St. John v. Hickey*, 411 F.3d 762, 770 (6th Cir. 2005).  And in order "to determine whether probable cause exists, [a court] consider[s] *only*

'the facts known to the arresting officer at the time of the arrest.'" *Hartman v. Thompson*, 931 F.3d 471, 481 (6th Cir. 2019) (emphasis added) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).  Since the officers did not know about the outstanding warrants "at the time of the arrest," the warrants cannot establish probable cause for the arrest.  And because (as explained above) a jury could find that the arrest was otherwise unsupported by probable cause, the officers are not entitled to summary judgment on Gaddis' false arrest claims on this basis.

Defendants counter that the decisions in *Devenpeck*, *supra*, and in *Atkins v. City of Chicago*, 631 F.3d 823 (7th Cir. 2011), establish that the warrants created probable cause for Gaddis' arrest even though the warrants were not known to the officers. But the holdings in those cases do no support Defendants' position.

In *Devenpeck*, a police officer stopped a suspect and learned facts sufficient to establish probable cause to believe that the suspect had committed the offense of impersonating an officer.  However, the officer did not arrest the suspect for that crime.  Instead, he arrested the suspect for violating the State of Washington's Privacy Act.  But at the time of the arrest, it was clearly established under Washington law that the suspect's conduct did not violate the Privacy Act.  The suspect later sued the officer for false arrest under 42 U.S.C. § 1983.  He claimed that the officer violated the Fourth Amendment by arresting him for violating the Privacy Act without probable cause to believe that he had done so.

The Supreme Court held that the arrest was lawful.  The Supreme Court first said that "[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152.  It then explained that because the arresting officer was aware of facts that were sufficient to establish probable cause to believe that the suspect had impersonated an officer, the arrest was lawful even though the officer arrested the suspect for a different offense – violating the Privacy Act.   In the Supreme Court's words:

> Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.  As we have repeatedly explained, the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action. [T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent. [E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.

*Id.* at 593-94 (citations and quotations omitted; emphasis in original).

*Devenpeck* does not support Defendants' argument that where officers make an arrest without knowledge of facts that would be sufficient to establish probable

cause, the arrest is nonetheless lawful if it so happens that the arrestee was the subject of an outstanding arrest warrant. Indeed, *Devenpeck* did not involve the arrest of a person who was the subject of an arrest warrant. And Defendants' counsel candidly acknowledged at the hearing before the Court that he could not find a single case in which any court had interpreted *Devenpeck* in the manner urged by Defendants. Moreover, the language from *Devenpeck* that does apply here actually undercuts Defendants' position. As noted above, the Supreme Court stressed that the validity of an arrest turns upon the facts known to the officer at the time of the arrest. That language suggests that where, as here, the arresting officers do not know that a suspect is the subject of an arrest warrant, the existence of that warrant cannot somehow legitimize an arrest that is otherwise unsupported by probable cause.

Nor does the Seventh Circuit's holding in *Atkins* support Defendants' position. In that case, the police unlawfully stopped a vehicle in which William Atkins was a passenger. After making the improper stop, the police discovered that there was an outstanding warrant for Atkins' arrest (for violating his parole), and they arrested Atkins. At the time of his arrest, Atkins protested that the warrant had been erroneously issued because his parole had expired, and he thus could not have violated it as alleged. The arresting officers nonetheless transferred Atkins to the Illinois Department of Corrections. More than thirty days later, the Illinois Parole Board determined that, as Atkins had claimed, he was being detained in error, and

32

the Board ordered his release.  Atkins then brought suit, alleging, among other things, that the officers unlawfully arrested him without probable cause.  The Seventh Circuit rejected that claim.  The court held that even though the initial stop was unlawful, the arrest of Atkins was lawful because it "was based on a valid warrant." *Atkins*, 631 F.3d at 827.

The critical distinction between *Atkins* and this case is that the officers in *Atkins* learned of the arrest warrant *before* they arrested Atkins, and they arrested Atkins *because he was the subject of the warrant*.  Here, in sharp contrast, the officers discovered the warrants for Gaddis only after they arrested him, and thus the arrest of Gaddis was not "based upon a valid warrant" known to the officers prior to the arrest. *Id*.  Simply put, *Atkins* stands for the proposition that, where police officers discover the existence of a valid warrant before making an arrest, the arrest is supported by probable cause. *See Underwood v. City of New York*, 2018 WL 1545674, at *3 (E.D.N.Y. Mar. 28, 2018) (adopting this reading of *Atkins*).  That principle is plainly not implicated here.

Instead of relying upon the actual holding of *Atkins*, Defendants direct the Court to dicta from that decision in which the Seventh Circuit said:

> If police stopped cars randomly, looking for persons against whom there were outstanding warrants, the drivers and passengers not named in warrants would have good Fourth Amendment claims.  *But a person named in a valid warrant has no right to be at large, and so suffers no infringement of his rights when he is apprehended unless*

33

>*some other right of his is infringed*, as would be the case
>had the police roughed up Atkins gratuitously in the course
>of trying to determine whether he was the person named
>in the warrant.

*Atkins*, 631 F.3d at 827 (emphasis added). Defendants interpret this dicta to mean

that since a person who is the subject of a valid warrant has no right to be free from

custody, that person suffers no Fourth Amendment violation if he is arrested by

officers who are unaware of the warrant. But Defendants "read[] this passage too

broadly. Its hypothetical simply illustrates that discovery [of] a valid warrant can

dissipate the taint of an unlawful stop, but says nothing about the lawfulness of

effecting an arrest *prior to* the discovery of an active arrest warrant." *Underwood*,

2018 WL 1545674, at *3 (emphasis in original) (rejecting a similar reading of the

dicta from *Atkins*). Moreover, to read the dicta as broadly as Defendants do would

bring the Seventh Circuit's words into conflict with the clearly established law,

noted above, that (1) an arrest must be based upon probable cause and (2) probable

cause is evaluated by the facts known to an officer at the time of arrest. For all of

these reasons, the Court declines to adopt Defendants' reading of the *Atkins* dicta

and to apply it here.

### D

Finally, Defendants argue that Gaddis may not challenge probable cause in

this civil proceeding because he had the opportunity to challenge probable cause at

the preliminary examination in his criminal case but did not adequately do so. (*See*

Defs' Reply, ECF No. 107, PageID.10508.)   The Court will not consider this argument because Defendants first raised it in their reply brief. *See Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 589 F.3d 835, 847 (6th Cir. 2009) (quoting *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1991)) ("The law in this circuit is well established that '[i]ssues raised for the first time in a reply brief are not properly before this court.'"); *Sundberg v. Keller Ladder,* 189 F.Supp.2d 671, 682–83 (E.D.Mich.2002) (noting, in the context of summary judgment, that "it is not the office of a reply brief to raise issues for the first time").

## V

The Court next turns to Gaddis' malicious prosecution claim against Kue, Richards, Marroquin, and Mason. (*See* Compl., ECF No. 1, PageID.15.)   In this claim, Gaddis contends that Kue, Richards, and Marroquin are liable for malicious prosecution because they made false statements about their interactions with him, and those statements contributed to his (Gaddis') wrongful prosecution.   Gaddis claims that Mason is liable because Mason omitted key exculpatory witness statements from his summary report to the prosecutor, and those omissions contributed to his (Gaddis') wrongful prosecution.   To prevail on his malicious prosecution claim, Gaddis must show: "(1) a criminal prosecution was initiated against [him] and the [Defendants] made, influenced, or participated in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a

consequence of the legal proceeding, [he] suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in [his] favor." *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015).

Defendants argue that Mason is entitled to summary judgment because Gaddis cannot show that he personally influenced or participated in the decision to prosecute Gaddis. Defendants further argue that Kue, Marroquin, and Richards are entitled to qualified immunity.[5] The Court addresses these defenses separately below.

## A

Defendants argue that Mason cannot be held liable for malicious prosecution because he "simply gathered all of the pertinent information and turned it over to the Wayne County Prosecutor, including the audio recorded statement of Mr. Gaddis, taken by Officer Lane, which was his only involvement in the investigation." (Defs' Br., ECF No. 75-2, PageID.5129.)   The Court disagrees.

---

[5] The Defendants' motion for summary judgment does not present qualified immunity arguments on behalf of Mason.  The brief in support of the motion mentions Mason only in the section addressing lack of personal involvement, which says nothing about qualified immunity. (*See* Defs' Br., ECF No. 75-2, PageID.5126-5129.)  A later section of the brief contains an argument heading which states that "Defendants" are entitled to qualified immunity from Gaddis' malicious prosecution claim, but that section never mentions Mason.  Instead, that section presents arguments that are specifically tied to Kue, Marroquin, and Richards by name. (*See id.*, PageID.5131-5138.)   The Defendants did attempt to present a qualified immunity defense on behalf of Mason in their reply brief, but raising the defense for the first time in that brief was too late. (*See* Section (IV)(D), *supra.*)

Defendants' argument does not take the facts in the light most favorable to Gaddis. Under that version of the facts, Mason's involvement was not as limited as Defendants claim. On the contrary, the record contains evidence that Mason did far more than merely gather and deliver information to the prosecuting attorney. As described above, there is evidence that he created a summary of witness statements in which he highlighted inculpatory evidence while omitting exculpatory evidence. (*See* Section (I)(C), *supra*.) There is also evidence that he met with the prosecuting attorney to discuss the case and answer questions. (*See id.*) For all of these reasons, the Court declines to grant summary judgment to Mason on the ground that his role in this case was strictly limited to gathering and delivering information to the prosecuting attorney.

## B

The Court next turns to Defendants' argument that Kue, Marroquin, and Richards are entitled to qualified immunity because they reasonably believed that there was probable cause to believe that Gaddis committed a crime. This is the same qualified immunity argument that the Defendants made with respect to Gaddis' false arrest claim. In fact, the Defendants present their qualified immunity arguments with respect to these two claims in a single section of their brief. (*See* Defs' Br., ECF No. 75-2, PageID.5131-5138.) The Court concludes that Kue, Marroquin, and Richards are not qualified immunity defense from Gaddis' malicious prosecution

claim for the same reason that they were not entitled to such immunity from Gaddis'
false arrest claim.  As explained in detail above, in presenting the qualified immunity
defense, the Defendants do not take the facts in the light most favorable to Gaddis,
and they draw inferences that no reasonable officer would have drawn.  The Court
therefore declines to grant Kue, Marroquin, and Richards qualified immunity on
Gaddis' false arrest claim.

VI

Finally, the Court considers Gaddis' municipal liability claim against the City
of Detroit.  Through that claim, Gaddis seeks to hold the City responsible under
Section 1983 for the officers' alleged violations of his constitutional rights.  The City
argues that Gaddis has not presented sufficient evidence to sustain a claim of
municipal liability.  The Court disagrees.

"[A] municipality may be found responsible for § 1983 violations, and
held liable for damages pursuant to *Monell v. New York City Department of Social
Services* [436 U.S. 658 (1978)]*,* if the plaintiff demonstrates that the constitutional
harm suffered was a result of the municipality's policy or custom." *Bible Believers
v. Wayne Cnty., Mich.*, 805 F.3d 228, 260 (6th Cir. 2015).  Here, for the reasons
explained below, the evidence, construed in the light most favorable to Gaddis, is
sufficient to support a finding that (1) the DPD had an unlawful custom and (2) that

custom caused the alleged violations of Gaddis' constitutional rights.  The City is therefore not entitled to summary judgment on Gaddis' municipal liability claim.

## A

To begin, Gaddis has presented sufficient evidence to support a finding that the DPD had an illegal custom.  "A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).  Gaddis is proceeding under the fourth option.  He argues that the DPD had a custom of tolerating (or acquiescing in) violations of citizens' constitutional rights because it "routinely and systematically failed to properly investigate the acts of misconduct of its officers" and failed to adequately discipline officers who committed "constitutional violations." (Gaddis Resp., ECF No. 99, PageID.6609.)  Gaddis has presented sufficient evidence in support of this theory.

## 1

It is "well recognized" that a municipal defendant's failure to investigate and discipline its police officers may amount to an unlawful policy or custom sufficient to support liability. *Sims v Tropicana Entertainment*, *Inc.*, 2016 WL 4801431, at *6

(D.N.J. Sept. 9, 2016). Indeed, the Sixth Circuit "has held that a [municipality's] failure to investigate complaints or discipline officers can give rise to § 1983 liability." *Dyer v. Casey*, 72 F.3d 129 (6th Cir. 1995) (Table), 1995 WL 712765, at *2 (6th Cir. 1995). As that court has explained, a plaintiff may establish that a municipality has an unlawful custom "by showing that the municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 882 (6th Cir. 2020). But a plaintiff must demonstrate more than a "*single* failure to investigate [and/or impose discipline related to his] claim." *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 495 (6th Cir. 2020) (emphasis in original). Rather, a plaintiff must show "a clear and persistent pattern of violations in earlier instances. That is, there must be multiple earlier inadequate investigations [and/or failures to discipline] and they must concern comparable claims." *Id.* (internal quotations and citation omitted). Stated another way, in order to establish that a municipality's failure to investigate or discipline police officers rises to the level of an unlawful custom, a plaintiff must show "a history of widespread abuse that has been ignored by the [municipality]." *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994). Requiring a plaintiff to make such a showing ensures that municipalities are held liable only when their failure to investigate and discipline rises to the level of "deliberate indifference." *Id.*

Gaddis has presented sufficient evidence that the DPD ignored a widespread pattern of misconduct and violations of constitutional rights. First, he has demonstrated a lengthy history of misconduct by Kue. For instance, he has submitted proof that Kue has been the subject of more than 200 citizen complaints. As David LeValley, the Assistant Chief of the DPD, candidly acknowledged, that is "an extraordinarily high number" of citizen complaints. (LeValley 8/5/21 Dep., ECF No. 119-3, PageID.10932.)   And in numerous instances, citizens complained about the very same type of misconduct that Kue is accused of committing in this case: using excessive force, lying in connection with an investigation, and using excessive profanity. (*See* Gaddis Resp., ECF No. 99, PageID.6609-6614, summarizing complaints – many of which are included in the record.) Notably, DPD investigators found that many of these complaints had merit. For instance, investigators made at least six separate findings that Kue was untruthful – including findings that he committed perjury, lied during *Garrity* interviews,[6] and falsified police reports. (*See id.*, PageID.6610, summarizing evidence in the record.)   Likewise, DPD investigators sustained complaints of excessive force against Kue on at least three

---

[6] A *Garrity* interview is an examination of a public employee during an internal investigation of the employee's official conduct. *See Garrity v. New Jersey,* 385 U.S. 493 (1967).

occasions.[7] (*See* Kue Compl. Chart, ECF No. 103-3, PageID.9767-9771, summarizing complaints and outcome of investigations into complaints.)

Second, Gaddis has presented evidence from which a jury could reasonably find that the DPD's response to Kue's pattern of misconduct was tantamount to ignoring it. For example, he has presented evidence that, in several instances, DPD investigators determined that citizen complaints against Kue were valid, but higher-ranking officers within the DPD nonetheless imposed no discipline upon him. (*See* Gaddis Resp., ECF No. 99, PageID.6620, summarizing evidence in the record.) And even in the rare instances where high-ranking officials *did* impose disciplinary measures after DPD investigators found merit in serious complaints against Kue, that discipline was not meaningful or substantial. (*See id.*) As LeValley

---

[7] While DPD investigators found that many of the citizen complaints against Kue had merit, the investigators did not make the final determination as to whether Kue had committed, or should be disciplined for, the alleged misconduct. As the City has explained, the DPD's disciplinary process functioned somewhat like the criminal justice system. (*See* Defs' Reply, ECF No. 107, PageID.10521-10522.) In the DPD's process, the investigators functioned as "prosecutors," and higher-ranking officers and/or trial boards functioned as a judge or jury would in a criminal proceeding. (*Id.*) The City suggests that the Court should not place too much weight on the investigators' findings because the investigators do not make the final determination as to whether an officer committed the misconduct of which he had been accused. The Court agrees that the investigators' findings do not conclusively establish that Kue committed misconduct. However, the investigators' findings do provide evidence that there was a basis for the citizens' complaints. Moreover, the fact that Kue did not face serious discipline despite the volume of findings made against him by the investigators raises a question as to the reliability and sufficiency of the decision-making by the high-ranking officers and trial boards who made the ultimate decisions in the disciplinary proceedings against Kue.

acknowledged, it was "problematic" that Kue was never meaningfully "disciplined for the behavior that he was found guilty of." (LeValley 10/19/21 Dep. ECF No. 129-3, PageID.11501-11502.)   LeValley further conceded that "with respect to Officer Kue there are instances where disciplinary action should have been taken," but was not. (LeValley 8/5/21 Dep., ECF No. 119-3, PageID.10952.)  And LeValley confirmed that at least "some ranking members" of the DPD knew about Kue's troubling record during the period in which he did not face meaningful discipline. (LeValley 10/19/21 Dep. ECF No. 129-3, PageID.11506.)

One instance of the DPD's inadequate response to Kue's misconduct stands out.  In 2015, Kue participated in a narcotics raid where a dog was shot and killed. (*See* Force Investigation, ECF No. 100-22, PageID.7897.)  A Force Investigator for the DPD conducted an investigation into circumstances surrounding the shooting. That investigation took one year to complete. (*See* Trial Board Records, ECF No. 100-26, PageID.8233.)   Throughout the course of that investigation and the subsequent criminal proceedings, Kue denied that he had fired his gun at the dog during the raid. (*See* Force Investigation, ECF No. 100-23, PageID.7923, 7984.) But the investigator concluded that Kue was lying, and that Kue had, in fact, fired his gun at the dog. (*See id.*, PageID.7923-7924.)  The DPD's Professional Standards Bureau then took up the matter, but it did not issue a final report until another two years had passed.   In its report, the Professional Standards Bureau similarly

concluded that Kue had lied during his interview and during his sworn testimony before the court. (*See id.*, PageID.7958, 7986.)  After another eight months passed, the DPD's Disciplinary Administration recommended that the DPD terminate Kue's employment due to his dishonesty. (*See* Trial Board Record, ECF No. 100-26, PageID.8241.)  But a mere two days after this recommendation to fire Kue, a DPD commander closed the file without imposing any discipline whatsoever on Kue because he determined that the investigators failed to complete their review and make their recommendations in a "time[ly]" manner. (*Id.*, PageID.8233.)  Simply put, as LeValley admitted, Kue walked away scot-free from misconduct that should have resulted in his termination because the DPD unduly delayed its review and disciplinary proceedings. (LeValley 10/19/21 Dep., ECF No. 129-3, PageID.11514-11515.)  LeValley agreed that this was "an example" of a case involving "fairly egregious behavior" that "end[ed] up getting dismissed." (LeValley 8/5/21 Dep., ECF No. 119-3, PageID.10928.)

Surprisingly, the DPD promoted Kue a mere four months after the DPD's Disciplinary Administration recommended that he be terminated for lying under oath. (*See id.*, PageID.10939.)  LeValley "agree[d]" that promoting Kue under those circumstances was "concerning," and he could not explain why Kue was promoted so soon after he was nearly terminated for egregious misconduct. (*Id.*)

44

Importantly, Gaddis has presented evidence that the DPD's delay in investigating and disciplining Kue was not an isolated slip-up. On the contrary, Gaddis has shown that the DPD routinely took far too long to investigate citizen complaints, that those inordinate delays led the arbitrators who oversaw disciplinary appeals to dismiss "a lot of discipline cases" against officers, and that the arbitrators told the DPD that its delays were resulting in the dismissal of complaints. (*See id.*, PageID.10926). As LeValley acknowledged, prior to 2019, "cases were falling into a black hole and arbitrators were ruling against the department [when the department made a finding that an officer committed misconduct] because the cases weren't being investigated in a timely manner." (*Id.*)

Gaddis also submitted evidence that the DPD's failure to discipline Kue stemmed, in part, from known serious flaws in its overall system for investigating citizen complaints and disciplining officers. For instance, Gaddis has shown that when DPD investigators were reviewing citizen complaints against an officer, the investigators did not "look[] at … all allegations of similar misconduct" against the officer. (LeValley 10/19/21 Dep. ECF No. 129-3, PageID.11488.) LeValley conceded that this failure to holistically consider officers' disciplinary records was "one of the deficiencies in the way in which the [DPD] handled such investigations." (*Id.*) Similarly, LeValley explained that when a complaint against an officer "has been sustained at the disciplinary phase … the officer's entire history was not looked

at in determining what, if any, discipline penalty to impose on that officer," and he further acknowledged that this was a "serious deficiency" in the disciplinary process. (*Id.*, PageID.11488-11489.) Finally, DPD Lieutenant Richard Firsdon acknowledged that, before July 21, 2017 (the date Gaddis was shot and arrested), the DPD was "not considering untruthfulness [by its officers] as seriously as [it] should have." (Frisdon Dep., ECF No. 127-2, PageID.11271.) This evidence supports Gaddis' contention that known flaws in the DPD's disciplinary system allowed Kue – who had a lengthy disciplinary history, including allegations of excessive force and findings of untruthfulness – to escape serious discipline that should have been imposed upon him.

Based on all of this evidence, construed in the light most favorable to Gaddis, a jury could reasonably find that the DPD had a custom of tolerating and/or acquiescing in (1) the use of excessive force by its officers and (2) dishonesty in disciplinary investigations and other official proceedings.

**2**

Numerous other district courts have concluded that evidence like that presented by Gaddis was sufficient to create a material factual dispute as to whether a municipality had a custom of tolerating widespread constitutional violations by its police officers. The recent decision by United States District Judge David M. Lawson of this Court in *Shumate v. City of Adrian*, 2021 WL 3145709 (E.D. Mich.,

July 26, 2021), *aff'd on other grounds*, 44 F.4th 427 (6th Cir. 2022), is a good

example.  The plaintiff in *Shumate* alleged that a City of Adrian police officer used

excessive force when he tased the plaintiff.  The plaintiff sued the officer and brought

a municipal liability claim against the City of Adrian in which he sought to hold the

City liable for the tasing.  The City moved for summary judgment on the municipal

liability claim.  It argued that the plaintiff lacked sufficient evidence that it had a

custom or policy of tolerating excessive uses of force by its officers.  In response,

the plaintiff presented evidence that the officer who tased him had been the subject

of many citizen complaints of excessive force but had not been subjected to any

meaningful discipline.  The plaintiff contended that that evidence was sufficient to

create a material factual dispute as to whether the City had a custom or policy of

tolerating excessive force.

Judge Lawson agreed with the plaintiff.  In a passage that applies with full

force here, he wrote:

> City of Adrian Police Chief Vincent Emerick testified that
> before the day in question, [the officer] was the subject of
> 15 citizen complaints over a span of three years, and seven
> of those complaints resulted in "minor discipline."
> Emerick conceded that seven incidents resulting in
> discipline was a "high" number. Chief Emerick also
> concluded based on his review of the incidents that [the
> officer] displayed a "pattern of behavior where he
> aggravated situations," and he characterized the encounter
> with the plaintiff as another example of [the officer's]
> tendency to escalate situations toward the use of force,
> where force would not have been required with a more

"patient" approach. However, despite the documented tendency to escalate situations toward use of unnecessary force, [the officer] received only "minor discipline" for prior, similar incidents consisting of "counseling by a supervisor." It was not until a complaint about the subject incident was lodge[d] by Ms. Shumate that [the officer] was subjected to a brief five-day suspension.

To prevail on a failure-to-discipline theory against the City, the plaintiff must establish "deliberate indifference" by responsible officials to repeated infractions by officers, which requires "a showing of a history of widespread abuse that has been ignored by the City." *Berry*, 25 F.3d at 1354. Similar and even fewer numbers of incidents where citizens were mistreated by officers with a tendency toward inappropriate treatment have been found to establish that "widespread abuse" was unmet by any appropriate supervisory response. *E.g.*, *Lipman v. Budish*, 974 F.3d 726, 748 (6th Cir. 2020) (six incidents); *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989) (14 incidents). In this case, the record adequately suggests that [the officer] engaged in a pattern of improper policing that repeatedly featured inappropriate escalation of encounters toward unnecessarily forceful altercations, and despite observing that alarming pattern the City chose to respond with nothing more than "counseling" and "memos" on the inappropriate behavior, rather than any substantial discipline. That is sufficient at this stage to sustain the plaintiff's *Monell* claim on a failure to discipline theory.

*Shumate*, 2021 WL 3145709, at ** 9–10.

The decision in *Hayward v. City of New Orleans*, 2004 WL 258116 (E.D. La. Feb. 12, 2004), is also instructive. The plaintiff in *Hayward* alleged that a City of New Orleans police officer used excessive force when the officer "brutally beat her and sprayed her with pepper spray without provocation." *Id*. at *1. The plaintiff also

brought a municipal liability claim against the City of New Orleans.  She alleged that the City was liable for the officer's actions "because city officials were aware of a number of similar incidents involving [the officer] but took no action to punish or reprimand him." *Id*. at *2.  The City moved for summary judgment on the ground that the plaintiff had failed to present sufficient evidence of a policy or custom.  The district court denied the motion.  It held that evidence of multiple complaints of similar misconduct against the officer, when viewed in conjunction with evidence that the City's own officials found the disciplinary process to be flawed, was sufficient to create a material factual dispute as to whether the City acquiesced in the officer's misconduct.  The court explained:

> The Plaintiff also claims that the City of New Orleans was deliberately indifferent to her civil rights by its failure to retrain or discipline Philibert despite its knowledge of a plethora of prior complaints of abuse. The evidence indicates that Philibert has been the subject of fourteen PID complaints and seven lawsuits in a nine-year period. Thirteen of those PID cases contained abuse-type complaints. Although almost all of which were either withdrawn, not sustained, or dismissed, the Plaintiff calls into question the adequacy of the PID's investigation of those complaints, stating that the complaints were supported by sufficient evidence but deliberately were not pursued by police supervisors.

> \*\*\*

> The Plaintiff claims that the Public Integrity Division was deliberately indifferent in its investigations into these complaints. In support of this claim, Hayward points out that even police supervisors found the PID's investigation

process inadequate. One PID investigation into an abuse complaint lodged against Philibert drew the ire of Police Superintendent Richard J. Pennington. Superintendent Pennington reviewed the police department's internal investigation of the complaint and found it to be inept.

\*\*\*

Despite this official determination of PID investigative deficiency, Hayward alleges that the city continued to ignore the need to train and discipline Philibert. She argues that the city's inaction in the face of repeated complaints constituted an official policy of deliberate indifference to constitutional rights under *Monell.*

\*\*\*

Hayward presents evidence of many previous abuse complaints against Philibert and suggests that the investigations of those complaints were formalistic and inadequate. Hayward alleges that city officials, such as Superintendent Pennington, were aware that the investigations were cursory and insufficient. She suggests that the prior investigations reveal a systematic inattention to official police complaints by city policy makers.

\*\*\*

In the present case questions of fact exist on whether city policy makers had notice of the abuse complaints against Philibert, whether the city was deliberately indifferent to abuse complaints against Philibert, and—if the city was deliberately indifferent in its investigation of previous civil rights claims—whether the city's failure to train or discipline Philibert was the moving force behind Ms. Hayward's injuries. Accordingly, the Defendants are not entitled to summary judgment on the Plaintiff's *Monell* claim for the city's failure to train or failure to discipline Philibert.

*Id.* at **5-6; *see also Sims*, 2016 WL 4801431 at ** 6-8 (denying a municipality's motion for summary judgment where plaintiff presented evidence that the municipality failed to conduct thorough investigations into six internal affairs complaints that had been filed against an officer in the three years preceding alleged misconduct by the officer); *Galindez v. Miller*, 285 F.Supp.2d 190, 199-200 (D. Conn. 2003) (denying municipality's motion for summary judgment where plaintiff presented evidence that the municipality, among other things, had a "pattern of allowing complaints [against officers] to molder and gray without adequate attention").

As these decisions (and others discussed below) make clear, Gaddis has presented sufficient evidence to create a material factual dispute as to whether the DPD had a custom of tolerating a widespread pattern of excessive force and dishonesty by its officers.

## B

The Court next addresses whether Gaddis has presented sufficient evidence that the DPD's unlawful custom caused the violations of his constitutional rights. The Court concludes that he has done so.

In the municipal liability context, a "high degree of predictability may … support an inference of causation — that the municipality's indifference led directly to the very consequence that was so predictable." *Bd. of Cnty. Comm'rs of Bryan*

*Cnty., Okl. v. Brown*, 520 U.S. 397, 409–10 (1997). And where a municipality repeatedly fails to investigate and discipline its officers for certain types of misconduct, it is "highly predictable" that the officers would have a "heightened inclination" to engage in that misconduct. *Monaco v. City of Camden*, 2008 WL 8738213, at *9 (D.N.J. Apr. 14, 2008). Thus, where a plaintiff presents evidence that a municipality "failed to properly supervise or discipline its officers, a reasonable fact-finder could, in turn, conclude that the [municipality's] action, or lack thereof … proximately caused plaintiff's injuries." *Merman v. City of Camden*, 824 F.Supp.2d 581, 594 (D.N.J. 2010); *see also Hayward*, 2004 WL 258116, at ** 6-7 (holding that evidence of repeated failures to investigate and discipline a police officer created a "question[] of fact" for the jury as to whether the municipality's inaction "was the moving force behind [the plaintiff's] injuries."); *Galindez*, 285 F.Supp.2d at 200 (evidence that municipality "fail[ed] to reasonably investigate complaints and the absence of punitive consequence for any accused officer" was sufficient to create a jury question as to whether municipality caused violation of the plaintiff's constitutional rights); *Hulett v. City of Syracuse*, 253 F.Supp.3d 462, 501-02 (E.D.N.Y 2017) ("A jury could conclude that, as a result of [the police department] leadership's well-known permissive attitude toward" the use of force by officers, "[t]he subordinate officers felt empowered to use force with relative impunity and that, as a result, used excessive force in this case.").

52

Here, as described in detail above, Gaddis has presented substantial evidence – including many significant admissions by a leader of the DPD – that the DPD repeatedly failed to meaningfully discipline Kue for misconduct similar to the constitutional violations alleged against Kue in this case. A jury could reasonably conclude from that evidence that it was "highly predictable" that Kue would violate Gaddis' constitutional rights by using excessive force against him (Gaddis) and lying during an investigation into the events in question. And that conclusion, in turn, could reasonably support a finding that the DPD caused the violations of Gaddis' constitutional rights.

## C

Defendants offer several counter-arguments as to why Gaddis' municipal liability claim against the City fails as a matter of law. None persuade the Court to dismiss the claim at this time.

To begin, Defendants argue that the City is entitled to summary judgment because Gaddis' claim rests on "the number of lawsuits and citizen complaints lodged against the individual officers," and the City insists that courts have "routinely" rejected efforts to impose municipal liability on the basis of citizen complaints and lawsuits. (Defs' Br., ECF No. 75-2, PageID.5151-5152.) However, Gaddis' municipal liability claim is not based solely on the sheer volume of complaints against the individual officers. On the contrary, he has shown that many

of the complaints against Kue were found to have merit by DPD investigators. Moreover, as further described above, Gaddis has provided testimony from high-ranking DPD officials confirming that the volume of citizen complaints against Kue was extraordinarily high and should have been of concern. Furthermore, Gaddis has supported his claim with evidence regarding specific, systematic deficiencies in the way the DPD was handling disciplinary proceedings. For all of these reasons, the City is not entitled to summary judgment on the ground that Gaddis erroneously rested his claim upon the volume of untested allegations against Kue.

Defendants next argue that Gaddis' municipal liability claim fails because he has shown, at most, that the DPD failed to discipline only a single officer: Kue. (*See* Defs' Reply, ECF No. 107, PageID.10521.) Defendants insist that "**a purported failure to discipline a single officer, as opposed to a systematic policy, cannot support a claim of municipal liability**." (*Id.*, emphasis in original.) But Gaddis has shown much more than a failure to discipline Kue. Once again, as set forth above, he has presented evidence – including testimony from high-ranking DPD officials – confirming that the DPD's overall system of discipline suffered from serious deficiencies. Kue's disciplinary record (or lack thereof) is offered as one glaring example of how the DPD tolerated serious officer misconduct.

Moreover (and in any event), while a municipal defendant's failure to discipline a single officer for a single prior instance of misconduct cannot support a

municipal liability claim, a municipal defendant's *repeated* failure to discipline a single officer for serious violations *can* support such a claim. *See, e.g.*, *Hayward*, 2004 WL 2581116 at ** 6-7 (holding that a claim of municipal liability may rest upon "a city's failure to discipline a *single* officer in light of *multiple* official abuse complaints") (emphasis in original); *Shumate*, 2021 WL 3145709, at ** 9-10 (denying municipality's motion for summary judgment where plaintiff presented proof that municipality repeatedly failed to discipline a single officer); *Sims*, 2016 WL 4801431 at *7 (explaining that one way a plaintiff can establish a municipality's liability "would be to show … that the officer whom a plaintiff accuses of using excessive force has been the subject of multiple similar complaints in the past" that have not resulted in meaningful discipline, and denying summary judgment because plaintiff presented evidence that the officer who allegedly used excessive force had been the subject of several excessive force complaints and had not been meaningfully disciplined).

Finally, Defendants argue that Gaddis' municipal liability claim fails because Gaddis has not shown that the DPD acted with deliberate indifference. Defendants assert that Gaddis cannot make such a showing because (1) the DPD had in place a system for investigating and disciplining officers and (2) the DPD was consistently looking for ways to improve its disciplinary system. (*See* Defs' Sur-Reply, ECF No. 131, PageID.11663). However, for all of the reasons explained above, a jury in this

case could reasonably conclude, after construing the evidence in the light most favorable to Gaddis, that (1) the DPD's procedures for investigating and disciplining officers were fundamentally flawed and (2) the DPD knew about the flaws and did not meaningfully act in a timely fashion to remedy the flaws. The jury could find, in short, that the DPD acted with deliberate indifference even though it had an operational discipline system.

As the United States Court of Appeals for the Third Circuit has explained, "the mere [existence of a police department's] procedures to receive and investigate complaints" is "not enough" to "shield [a municipality] from liability." *Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996). To protect a municipality from liability, the process "must be real," "must have some teeth," and "must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done." *Id.* And numerous courts have held that a police department's disciplinary process falls short of this standard – and thus does not insulate a municipality from liability – where the process suffers from the same flaws that (according to Gaddis'

evidence) plagued the DPD's disciplinary process.[8]  Accordingly, the City cannot avoid liability by pointing to the fact that the DPD had in place an operating discipline system and that some members of the DPD intended to improve that process.

## D

For all of the reasons explained above, Gaddis has presented sufficient evidence to support a finding that (1) the DPD had an unlawful custom of failing to investigate and discipline its officers for the use of excessive force and for lying in connection with investigations and (2) that custom caused the alleged violations of

---

[8] *See, e.g., Beck*, 89 F.3d at 973-76 (reversing summary judgment in favor of municipality where plaintiff showed, among other things, that the police department had received "a series of actual written civilian complaints of a similar *nature*" against an officer who allegedly used excessive force, that the department's disciplinary process "did not consider prior citizen complaints of the use of excessive force relevant in assessing the pending complaint under investigation," and that the department had not imposed meaningful discipline on the officer for any of the prior complaints because, among other things, it considered every complaint "in a vacuum"); *Merman v. City of Camden*, 824 F.Supp.2d 581, 591 (D.N.J. 2010) (denying municipality's motion for summary judgment where plaintiff presented evidence that there were a large number of similar citizen complaints concerning use of excessive force, that an officer's disciplinary history was not usually taken into consideration when evaluating a complaint against the officer, and that a large majority of citizen complaints resulted in the imposition of no discipline); *Cooper v. City of Jersey City*, 2021 WL 1589348 (D.N.J., April 22, 2021) (same); *Hulett*, 253 F.Supp.3d at 500-02 (denying summary judgment to municipality where police department's disciplinary procedures "did little more than create the appearance of accountability" because, among other things, so few officers were disciplined even after civilian review boards determined that they had committed violations).

Gaddis' constitutional rights. The City is therefore not entitled to summary judgment on Gaddis' municipal liability claim.[9]

## VII

For all of the reasons explained above, the Defendants' motion for summary judgment (ECF No. 75) is **DENIED**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: January 4, 2023

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 4, 2023, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126

---

[9] In addition to arguing that the City was liable because the DPD had a custom of failing to investigate and discipline its officers, Gaddis argued that the City may also be held liable because the DPD had a custom of tolerating racial discrimination and a "code of silence" by its officers. However, Gaddis has not asserted a substantive claim for violation of his right to be free from racial discrimination. Thus, the Court will not permit Gaddis to present a theory of municipal liability based upon the DPD's alleged tolerance of racial discrimination. Likewise, the Court will not permit Gaddis to present to the jury the theory that the City may be held liable based upon the DPD's purported tolerance of a "code of silence" among its officers. Gaddis has not presented sufficient evidence that any such purported tolerance was widespread. The municipal liability claim that Gaddis may present to the jury is one based upon the DPD's custom of failing to investigate and discipline its officers for serious misconduct.